IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

JAMES MAY,

        Plaintiff,

vs.                                       No. CIV 98-1065 JC/LFG

KENNETH S. APFEL, Commissioner,
Social Security Administration,

        Defendant.

## MAGISTRATE JUDGE'S ANALYSIS AND RECOMMENDED DISPOSITION[1]

Plaintiff James May ("May") invokes this Court's jurisdiction under 42 U.S.C. § 405(g) seeking judicial review of a final decision of the Commissioner of Social Security ("Commissioner"). The Commissioner determined that May was not eligible for disability insurance benefits ("DIB") or supplemental security income ("SSI").     May moves this Court for an order reversing the Commissioner's final decision and remanding for a rehearing.

### Factual Summary and Procedural History

May was born on September 4, 1959.  He was 36 years old at the time of the administrative hearing in this case.  He has an eighth grade education.  He has previously worked in a faucet factory, as a laborer in the construction industry, a derrick worker in the oil industry, a motel maintenance worker, and in a municipal water department. (Transcript of Proceedings, p. 119; hereafter cited as,

---

[1]Within ten (10) days after a party is served with a copy of the legal analysis and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such analysis and recommendations.  A party must file any objections within the ten day period allowed if that party wants to have appellate review of the analysis and recommendations.  If no objections are filed, no appellate review will be allowed.

"Tr. 119"). He alleges he has been unable to work since January 25, 1995 due primarily to a back injury with radiating numbness to the arms and legs. He also has hypertension, problems with his knee, his hearing, and depression.

May's application for Social Security benefits was denied at the initial and reconsideration stages, and he sought timely review from an Administrative Law Judge ("ALJ"). An administrative hearing was held on April 16, 1996. In a decision dated October 16, 1996, the ALJ found that May was not disabled within the meaning of the Social Security Act and denied the benefit request.[2] May challenged this determination to the Appeals Council which denied his request for review on July 17, 1998. This appeal followed.

## Standards for Determining Disability

In determining disability, the Commissioner applies a five-step sequential evaluation process.[3] The burden rests upon the claimant throughout the first four steps of this process to prove disability, and if the claimant is successful in sustaining his burden at each step, the burden then shifts to the Commissioner at step five. If at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.[4]

Briefly, the steps are: at step one, claimant must prove he is not currently engaged in substantial gainful activity;[5] at step two, the claimant must prove his impairment is "severe" in that

---

[2]The decision of the ALJ is attached to this Analysis and Recommended Disposition.

[3]20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f) (2000); Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

[4]20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f) (2000); Sorenson v. Bowen, 888 F.2d 706, 710 (10th Cir. 1989).

[5]20 C.F.R. §§ 404.1520(b), 416.920(b) (2000).

it "significantly limits [his] physical or mental ability to do basic work activities . . . .;"[6] at step three, the Commissioner must conclude the claimant is disabled if he proves that these impairments meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1 (2000);[7] and, at step four, the claimant bears the burden of proving he is incapable of meeting the physical and mental demands of his past relevant work.[8] If the claimant is successful at all four of the preceding steps, the burden shifts to the Commissioner to prove, at step five, that considering claimant's residual functional capacity ("RFC"),[9] age, education and past work experience, he is capable of performing other work.[10] If the Commissioner proves other work exists which the claimant can perform, the claimant is given the chance to prove he cannot, in fact, perform that work.[11] In the case at bar, the ALJ made his dispositive determination of non-disability at step five of the sequential evaluation.

### Standard of Review and Allegations of Error

On appeal, the Court considers whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards. Glenn v.

---

[6]20 C.F.R. §§ 404.1520(c), 416.920(c) (2000).

[7]20 C.F.R. §§ 404.1520(d), 416.920(d) (2000).  If a claimant's impairment meets certain criteria, that means his impairments are "severe enough to prevent a person from doing any gainful activity."  20 C.F.R. §§ 404.1525(a), 416.925(a) (2000).

[8]20 C.F.R. §§ 404.1520(e), 416.920(e) (2000).

[9]The Commissioner has established RFC categories based on the physical demands of various types of jobs in the national economy.  Those categories are:  sedentary, light, medium, heavy and very heavy.  20 C.F.R. §§ 404.1567, 416.967 (2000).

[10]20 C.F.R. §§ 404.1520(f), 416.920(f) (2000).

[11]Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).

Shalala, 21 F.3d 983 (10th Cir. 1994).  To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance.  Trimiar v. Sullivan, 966 F.2d 1326, 1329 (10th Cir. 1992).  In Clifton v. Chater, 79 F.3d 1007, 1009-1010 (10th Cir. 1996) the Tenth Circuit described, for purposes of judicial review, what the record should show:

> The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence.  Rather, in addition to discussing the evidence supporting his decision, the ALJ must also discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects.  [Citations omitted].

If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed.  The Court cannot reweigh the evidence or substitute its judgment for that of the Commissioner.  Hargis v. Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991).

May contends that the final administrative decision is not supported by substantial evidence and that the Commissioner did not apply the correct legal standards.  He claims that the ALJ erred in failing to include all of May's severe impairments at step two, in finding that May's severe back condition did not meet or equal the Listing at section 1.05(C), in making his RFC and credibility assessments, and in not obtaining a consultative psychological evaluation.  May also asserts that he was biased by incompetent representation at his administrative hearing.

## Discussion

A.  The Listings.

May contends that his back condition meets the qualification for a "vertebrogenic disorder" at 1.05(C), and the ALJ therefore erred in failing to find him disabled at step three.  This listing

requires a showing of a:

> vertebrogenic disorder (*e.g.*, herniated nucleus pulposus, or spinal stenosis) with the following persisting for at least 3 months despite prescribed therapy and expected to last 12 months.  With both 1 and 2:
> 1.  Pain, muscle spasm, and significant limitation of motion in the spine; and
> 2.  Appropriate radicular distribution of significant motor loss with muscle weakness and sensory and reflex loss.

May makes a very strong argument that his back condition comes within Listing 1.05(C).  The record shows that he experienced a herniated disc  (Tr. 198) and, as he correctly points out, the record is replete with evidence of the requisite pain,[12] muscle spasm,[13] limitation of range of motion in the spine,[14] along with radicular distribution of motor loss,[15] muscle weakness,[16] and sensory loss.[17]  May's condition also meets the requirement that these "abnormal physical findings must be shown to persist on repeated examinations despite therapy" so that "a reasonable presumption [may] be made that severe impairment will last for a continuous period of 12 months."  20 C.F.R. Pt. 404, Subpt. P., App. 1, § 1.00(B).

However, there is no indication in the medical records that May suffered a reflex loss, which is a requirement for this listing.  The few references to testing of May's reflexes indicate that  they

---

[12]Tr. 138, 147, 158-59, 170, 171, 176, 180, 182, 184, 185, 187, 189, 191, 193, 196-97, 235-43.

[13]Tr. 170, 171, 173, 176, 185, 189-90, 193, 235-43.

[14]Tr. 138, 245.

[15]Tr. 132-33, 148, 171, 174, 189.

[16]Tr. 132-33, 148, 174, 189.

[17]Tr. 132-33, 139, 174, 182, 187-88, 189.

have remained symmetrical and normal, "brisk," or "2+." (Tr. 161, 184, 197, 245). "To show that

an impairment matches a listing, the impairment 'must meet all of the specified medical criteria. An

impairment that manifests only some of those criteria, no matter how severely, does not qualify'."

Arrington v. Apfel, 185 F.3d 873 (Table, text in Westlaw), No. 98-7099, 1999 WL 446013, at *2

(10th Cir. July 1, 1999), *quoting from* Sullivan v. Zebley, 493 U.S. 521, 530, 110 S. Ct. 885 (1990).

        The Court therefore finds substantial evidence to support the ALJ's finding that May's

condition does not meet Listing 1.05(C).  *See*, Burns v. Shalala, 39 F.3d 1191 (Table, text in

Westlaw), No. 94-6050, 1994 WL 627954, at *2 (10th Cir. Nov. 9, 1994) ("the evidence of reflex

loss is sketchy at best, with only one physician noting such loss in July 1990 . . .  There is no evidence

that this loss continued through a three-month period"); Harris v. Secretary of Heath & Human

Servs., 821 F.2d 541, 543 (10th Cir. 1987) ("Although the record discloses most of these [1.05(C)]

characteristics, it does not reveal a medical finding that the claimant has experienced sensory loss";

therefore, he does not meet the Listing).

        Thus, although May does not meet all of the qualifications for a finding of disability at step

three, he meets most of the requirements for this listing and came very close to being considered *per*

*se* disabled.  The Court notes that the ALJ's opinion contains no discussion or examination of the

record in connection with his finding at step three; he states only that he reviewed Listings 1.00 *et*

*seq.*, 2.00 *et seq.*, and 4.02, and "conclude[d] that the claimant falls short of satisfying the severity

requirements under the preceding impairments."  (Tr. 18).  An ALJ is "required to discuss the

evidence and explain why he found that appellant was not disabled at step three," rather than merely

state a summary conclusion.  Clifton, at 1009.  In light of the ultimate conclusion that May is entitled

to an immediate award of benefits, the Court will not send this matter back for such review and explanation but reminds the Commissioner that a fuller explanation, as required by the Tenth Circuit, assists this Court in conducting "meaningful judicial review." Id.

B. RFC and Credibility Assessment.

The ALJ found that "claimant's subjective allegations are not borne out by the overall record and are found not to be fully credible." (Tr. 18). May contends that the ALJ erred in his assessment of credibility and in finding that May could perform a full range of sedentary work; rather, he argues, "[e]vidence in the file clearly indicates that Mr. May is unable to perform a full range of work at any exertional level." The Court agrees and hold that, while the ALJ conducted a thorough hearing and raised the appropriate issues in his opinion, his credibility finding and RFC assessment are not supported by substantial evidence.

1. Standards for Making RFC and Pain Assessments.

In making the RFC assessment, the ALJ is to consider the claimant's impairments, and any related symptoms such as pain which may cause physical and mental limitations, and then assess "what [the claimant] can still do" despite these limitations. 20 C.F.R. §§ 404.1545(a); 416.945(a) (2000).

> RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule. RFC does not represent the least an individual can do despite his or her limitations or restrictions, but the most.

SSR 96-8p, 1996 WL 374184, at *2. "RFC is the maximum degree to which the individual retains the capacity for sustained performance of the physical-mental requirements of jobs." SSR 83-10,

1983 WL 31251, at *7.

A claimant alleging disabling pain must present evidence of medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that could "reasonably be expected to produce the pain or other symptoms alleged." 42 U.S.C. §423(d)(5)(A); 20 C.F.R. §§ 404.1529(a), 416.929(a) (2000). There is no question that May suffered from physical impairments which are documented by "medically acceptable clinical or laboratory diagnostic techniques"; the issue is whether the conditions could reasonably be expected to produce the degree of pain alleged. The ALJ found that they could not. The Court will generally give deference to the ALJ's conclusions regarding a claimant's credibility and "may not disturb the ALJ's finding when the appellant's complaints of pain are not supported by the medical evidence in the record." Campbell v. Bowen, 822 F.2d 1518, 1522 (10th Cir. 1987). However, "[f]indings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." Huston v. Bowen, 838 F.2d 1125, 1133 (10th Cir. 1988).

Once the claimant demonstrates an impairment, and at least a loose nexus between the impairment and the pain alleged, the ALJ must consider all the evidence presented that could reasonably produce the pain alleged. Luna v. Bowen, 834 F.2d 161, 165 (10th Cir. 1987). Factors to be considered include the claimant's persistent attempts to find relief for the pain and his willingness to try any treatment prescribed, whether he had regular contact with a doctor, the possibility that psychological disorders combine with his physical problems, the nature of his daily activities, the dosage and effectiveness of any medications, and subjective measures of credibility that are peculiarly within the judgment of the ALJ, Id.; Hargis, at 1489.

2. The ALJ's Credibility and RFC Assessments
Are Not Supported By Substantial Evidence.

a. The Medical Record.

May's medical records clearly establish physical impairments which could reasonably be expected to produce the pain alleged. They also portray a man who is determined, even desperate, to work in spite of his pain. May herniated a disk on September 8, 1993. He was digging a hole and developed acute back pain when he twisted with a shovel full of dirt. He continued working but by the next day, the pain had increased and he found "he could not support the weight of his body with his legs." (Tr. 196). Over the next few days, he continued to have severe low back pain, with spasms, tingling, and numbness running down both legs. He went to a chiropractor, but the chiropractor would not treat him due to the swelling in his lower back. (Id.).

Five days after the twisting incident, May went to see Dr. Jonathan Burg, M.D. He told Dr. Burg that if he sits for more than a few minutes, he cannot feel his legs at all. (Id.). Dr. Burg noted that May was "in obvious painful distress," and that, "This is about the most acutely painful presentation for a back strain as I have seen in some time." (Tr. 197). An MRI done on September 15, 1993 showed disc herniation with mild impression on the thecal sac (the outermost membrane covering the spinal cord[18]). (Tr. 198).

Dr. Burg diagnosed May with a herniated disc at L4-5 and treated him with an epidural steroid. This alleviated the leg pain, although some back pain remained. Dr. Burg released May to return to work on October 11 for four hours per day, with a 25-pound lifting restriction, and after one week, he could go up to eight hours per day with the same weight restriction. Dr. Burg also

_____

[18]Dorland's Illustrated Medical Dictionary 1354, 409 (26th ed. 1981) (hereafter, "Dorland's").

9

placed May in a spine strengthening and education program.  (Tr. 195).   May returned to work as instructed by his doctor, but on October 19, 1993, he hurt his neck while using an iron girder to break up some concrete.  Examination on that date showed pain and spasm in the cervical musculature, with restricted range of motion.  (Tr. 193).

On November 8, 1993, Dr. Burg prescribed oral steroids to calm the inflammation and ordered May to continue with the spine program.  May told Dr. Burg he was concerned that his boss would fire him; Burg told him, "there is nothing we can really do except try and get [your] back better while trying to keep [you] at work."  (Tr. 191).  He released May to work 6 hours per day, with a 25-pound lifting restriction.  (Tr. 191-92).  Ten days later, May returned to see Dr. Burg, complaining that for the past two days, he felt back pain and noticed his legs "giving out" and a feeling as if the "blood was being drained out of them."  (Tr. 189).  Dr. Burg diagnosed an acute muscle spasm caused by the herniated disc and treated him with a trigger point injection of Procaine.  Dr. Burg noted that May was "quite adamant about returning to his job today because he is behind on car payments, etc."  The doctor released him to work.  (Tr. 189-90).

On December 10, 1993, Dr. Burg noted that May had radiculopathy,[19] established by MRI, and that although he continuee to have intermittent problems with low back pain as well as radiating pain and numbness, he had reached maximum medical improvement.  He prescribed Percocet, and noted that May could continue to work with a 25-pound lifting restriction.  (Tr. 187-88).  On January 3, 1994, May returned to see Dr. Burg, asking for trigger point injections, "as they seem to be the only thing that really relieves his muscle spasms."   The doctor again noted that May had reached maximum medical improvement and that he was continuing to work on a modified duty status.  (Tr.

_____

[19]Radiculopathy:  disease of the nerve roots.  Dorland's, at 1109.

185).  In April 1994, May returned with complaints of "zingers," or electrical sensations down both buttocks and into the right arm.  This was a new symptom, and the doctor felt it was due to neuropathic pain from the lower back disc herniation, with a possible herniation in the neck as well. Dr. Burg prescribed oral steroids and directed May to return to physical therapy twice weekly.  He wrote in the progress notes, "I suspect that because of his motivation and desire to stay at work, he will continue to do well and the physical therapy should be quite helpful in decreasing the amount of pain that he is having at this point."  (Tr. 184).

On May 9, 1994, Dr. Burg noted that May's low back pain was increasing, and he continued to have numbness in his legs.  He noted also that May "is really having trouble working.  He is considering getting a different type of work which I think would not be a bad idea," as the heavy work he was doing exacerbated his symptoms.  (Tr. 182).  May underwent an epidural steroid injection that day, which alleviated the pain.  (Tr. 158-59).  On June 1, and again on July 20, the doctor noted that May continued to work full time (Tr. 180-81), although in July, he began again to have increased complaints of back pain and Dr. Burg restarted him on physical therapy.  (Tr. 180). On July 28, 1994, May's physical therapist noted that he was working as a motel maintenance worker, doing a lot of heavy physical labor, and was unwilling to take time off work to allow his back to heal.  (Tr. 167).

In August 1994, Dr. Burg noted that he had "a long talk [with May] regarding his vocational plans."  He advised May that heavy labor was no longer a work option as it exacerbated his back problems, and he advised him that retraining into a more sedentary occupation would lower his medical costs.  (Tr. 177).  Dr. Burg wrote a letter which appears to be to a worker's compensation insurance adjuster, noting that May continuously develops significant back pain while doing necessary

job tasks such as climbing a ladder, sweeping, bending over, and picking things up.  He stated that May could not continue to do the type of work he had been doing because it had caused exacerbations of his back pain.  He was in dire financial straits; his wife was staying home at that point to take care of the couple's 20-month old twins, and in spite of his physical problems, "the patient has remained very work oriented with a very strong work ethic."  (Tr. 178).  He requested vocational counseling for May, so that he could continue to be productive.  (Tr. 179).

On November 23, 1994, May experienced increased back pain and returned to see Dr. Burg for follow-up treatment.  Dr. Burg prescribed a muscle relaxant and pain medication and also noted that May had been evicted from his apartment and was living in his car. (Tr. 176).  It was not until Feburary 1995 that May filed an application for Social Security disability benefits.  (Tr. 65-68).

In that same month, May went to the emergency room at University Hospital with a knee injury he sustained when he collapsed after his right leg went numb.  (Tr. 132-33).  He went to see Dr. Burg for follow-up treatment on his knee on February 24.  At that time, Dr. Burg noted that May was continuing to work full time installing security systems.  (Tr. 175).  In June 1995, May reported to Dr. Burg that he had fallen three or four times since February due to his legs giving out.  (Tr. 148).

May was seen by consulting physician Dr. Donna L. Deming, M.D. on April 11, 1995.  She found that he was "in no acute distress, though he is uncomfortable from his back particularly with prolonged sitting."  (Tr. 138).  She found the range of motion in all joints to be normal, with the exception of the back.  He could squat and walk on toe and heel, although walking on the heels markedly increased his back pain.  He could not extend his right hip backward because of back pain. She also found muscle tightness in the lumbar region and tenderness in the sacroiliac joint and in the

low lumbar spine. His neurological exam was within normal limits. Her impression was chronic low back pain with radiation of numbness to the right leg, without evidence of radiculopathy, plus controlled hypertension, and a perforated eardrum with reduced hearing in the right ear. (Tr. 135-39).

By July 10, May reported to Dr. Burg that his pain was limiting his ability to perform work tasks, that he was not working as much as before, and that he is having trouble making ends meet. (Tr. 147). Dr. Burg stated on July 24 that May clearly could no longer do heavy work, although he did not rule out light or sedentary work. (Tr. 146). May returned to see Dr. Burg in September 1995, asking to be taken off all medication, as he didn't want to use "mind-altering drugs." He also told Dr. Burg that he had fallen several times due to numbness in his legs, including an incident where he fractured his toes and didn't realize it until he saw the x-rays. (Tr. 174). After trying to quit Valium, May experienced severe muscle spasms and was advised by Dr. Burg to ease off more slowly. (Tr. 173). In October 1995, May exacerbated his back in a fall sustained while he was attempting to install duct work. (Tr. 60, 172).

In November 1995, a rehabilitation counselor with the New Mexico Division of Vocational Rehabilitation (DVR) stated in a letter, "It is uncertain at this time whether James can sustain gainful employment." She noted also that the DVR had to close May's case the preceding summer, because his physician would not release him to return to work. (Tr. 169). In December 1995, May returned to see Dr. Burg with increased muscle spasms and back pain caused when his legs gave out and he fell on some stairs. He received trigger point injections and analgesic medications. (Tr. 171).

May's muscle spasms continued through 1996.[20]  Dr. Burg continued to treat him with analgesics and trigger point injections.  (Tr. 170, 235-43).  In May 1996, claimant was seen by Dr. Mark D. Erasmus, M.D., who noted significantly decreased range of motion in the back due to muscle spasm, pain in the neck, and decreased sensory reaction to pinprick in right arm.  An MRI of the cervical spine was normal, but the lumbar spine showed an L5-S1 disk degeneration with a central bulge.  Dr. Erasmus felt that surgical intervention was not a realistic option, as a diskectomy or fusion would not help the symptoms.  He recommended pain clinic management and vocational rehabilitation.  (Tr. 244-46).

In June 1996, May returned to see Dr. Burg with severe pain in the neck, back, and right knee.  He was treated with trigger point injections.  (Tr. 239).  By July, May was still taking medication for muscle spasms, although he was doing better on the Prozac prescription Dr. Burg had given him for pain and was beginning to work out and walk for exercise.  (Tr. 237).  However, As of October 1996, May was still having back pain but was trying to taper off his medications; Dr. Burg noted that he was working part time "within restrictions."  (Tr. 235).

In February 1997, Dr. Burg filled out a form stating that May would not be able to work full-time at sedentary work, in that he could not sit, stand, or walk for any longer than 30 minutes at a time,  nor for longer than 2 hours total in a day, and that he "should be considered totally and completely disabled from any gainful employment."  (Tr. 231-34).  He also noted that May could lift up to five pounds only occasionally, and that he could grasp with both hands but could not push or

---

[20]Medical records for the period since the administrative hearing were submitted by May's counsel at the Appeals Council stage of the proceedings and were included in the record.  New evidence submitted to the Appeals Council may be considered if it relates to the period on or before the date of the ALJ's decision, which in this case was October 16. 1996.  20 C.F.R. §§ 404.970(b); 416.1470(b) (2000).

pull, or do fine manipulation.  (Tr. 233).  He could not bend, squat, crawl, or climb.  (Tr. 234).

    b.  The Pain Assessment.

    Even discounting this last report by Dr. Burg, as the Commissioner would have the Court do because it was  prepared following an adverse decision and at the behest of claimant's counsel, the record will not support the ALJ's finding that May could do a full range of sedentary work, without restriction due to pain.

    As noted above, in making a credibility assessment, the ALJ is to take account of medically acceptable clinical or laboratory evidence showing the existence of an impairment which could reasonably be expected to produce the pain alleged; determine if there exists a nexus, even a loose one, between the impairment and the pain alleged; and then consider all the evidence, taking note of the following factors:  the claimant's persistent attempts to find relief for the pain, his willingness to try any treatment prescribed, whether he had regular contact with a doctor, the possibility that psychological disorders combine with his physical problems, the nature of his daily activities, the dosage and effectiveness of any medications, and subjective measures of credibility that are peculiarly within the judgment of the ALJ, Luna, at 165.

    The record clearly shows an impairment and the required nexus between the impairment and the pain alleged.  May had a herniated disc in the lumbar region, numbness in his extremities which caused several falls and led to a knee injury, and an additional injury to his upper back.  He has seen his doctor quite regularly over the past several years, as the medical records show.  He made persistent efforts to relieve the pain and to continue working.  He did not refuse any medical treatment and attended physical therapy sessions as directed by his doctor.  The medications and other treatments taken by May did help to relieve his pain but they upset his stomach badly and, in

15

any case, he continued to find it necessary to return to Dr. Burg on approximately a monthly basis over a three-year period for further palliative treatment for the pain. May stated at the administrative hearing that the injections Dr. Burg gave him helped, but the pain relief only lasted about three days, and sometimes he would exacerbate his back injury during this period by thinking he could lift more than he was actually capable of lifting. (Tr. 57-58).

The ALJ relied on May's daily activities, particularly as described to consulting physician Dr. Deming, as part of the basis for his credibility ruling. (Tr. 18). May told the consulting doctor that his right leg often goes numb and gives out on him, that he can pick up 30 to 50 pounds from his side but can't pick up a one and a half-pound weight from the front, and that although he can pick up one of his 25-pound twin boys from the side, his leg goes numb if he tries to carry the child around. He is afraid to drive because sitting causes numbness in his right leg. (Tr. 136).

May also told Dr. Deming that it varies how long he can stand; sometimes he can only stand for five minutes, sometimes up to five hours. He can walk two hours at a time. He can sit for about ten minutes but then gets uncomfortable, and he cannot sit at all on a hard seat. Dr. Deming noted that, after sitting for about ten or fifteen minutes in the examination room, May became uncomfortable and had to get up and move around. (Tr. 136-37). May told the doctor that he does not do any housework, he takes walks and helps with child care, does some yard work and household repairs, and is responsible for his own personal hygiene. He pursues no hobbies or civic activities. (Tr. 137-38).

The ALJ found that "claimant's portrayal of his level of pain and his activities of daily living are contradicted by the information he gave to a consultative examiner, Donna L. Deming, M.D." (Tr. 18). However, the Court finds that the information May gave to Dr. Deming is remarkably

consistent with information as to his daily activities as set forth elsewhere in the record.  He stated in his Disability Report, dated February 16, 1995, that he picks up after his kids, tries to help his wife prepare dinner, sets the table, loads the dishwasher, takes daily walks for 1-4 hours with period rests, visits with friends, and does not do grocery shopping or yard work.  He says he can't sit for long periods of time, and although he drives short distances, driving gets hazardous when his leg goes numb.  He has no church or other group activities.  (Tr. 118, 122).

At the administrative hearing, he testified that he drives only short distances, no more often than once a week, that he visits friends occasionally, mostly when they come to see him, that he does not go to church or other group meetings, and he doesn't fish or hunt or pursue any hobbies. (Tr. 43-45).  He stated further that he tries to help with the housework, does cooking and a bit of dishwashing if it can be done quickly and doesn't require standing in one place for very long or bending over.  He said that he does not do any laundry or shopping, except for short runs to the store for himself, and he does not do grocery shopping for the family.  He watches his twin children while his wife works, bathing and feeding them and putting them to bed.  (Tr. 45-47).  He can bathe and dress himself, although he sometimes needs help getting his shoes off, has to put a chair in shower, and can't stand long enough to complete a shave.  (Tr. 47, 53).  He has difficulty bending over, getting on and off the commode, and climbing stairs.  (Tr. 48-49).

He also testified at the hearing that he can sit only for 15-20 minutes at time, although sometimes he can sit longer with pain medication.  He can't stand still at all, although he can walk for about 30 minutes at a time.  (Tr. 50-51).  He can pick up one of his children, but only on his side.  He can't lift a hammer in front of him.  (Tr. 52).

Aside from a few minor discrepancies, the testimony at the administrative hearing and the

17

information set forth in Social Security forms is very much the same as that given Dr. Deming.  The
Court finds no support in the record for the ALJ's finding that May's "portrayal of his level of pain
and his activities of daily living are contradicted by the information he gave" to Dr. Deming.  The
activities described by May are not inconsistent with disabling back pain.   The claimant "need not
prove that her pain precludes all productive activity and confines her to life in front of the television."
Baumgarten v. Chater, 75 F.3d 366, 369 (8th Cir.1996).

     The ALJ's credibility finding is also based in part on the fact that he continued to work, and
attempt to work, even while seeing a doctor regularly for pain.  (Tr. 18, 19).  However, there are
many indications in the record that May re-injured himself, or exacerbated his earlier problems, by
his determination to continue working in spite of the pain.  He has an eighth grade education and his
entire work experience consists of heavy labor.  In order to maintain employment after the injury, he
was forced to do the kind of work that would almost inevitably do more damage to his body.  The
ALJ found at step one that May had not engaged in substantial gainful activity since his onset date.
(Tr. 17).  Sporadic attempts to continue working, in spite of a herniated disc and leg numbness,
should not be used against him under the facts of this case.          May testified at the administrative
hearing that the work he did after he sustained a herniated disc in September 1993 was "very
secondary work."  (Tr. 54).  He and his family were living at a motel where he was doing
maintenance work to pay the rent, when he had to stop working.  His wife became the bookkeeper
for the motel, which is how they were able to stay on there.  (Tr. 35).  He attempted to do
maintenance work for another motel but had to quit because he couldn't work steadily due to his
impairment.  (Tr. 37-38).  In the few months prior to the hearing, he was working once a month,
oiling a motor for someone to whom he owed money, in order to pay off the debt.  (Tr. 39-40).  He

has tried to do some part-time work, including hauling things with a truck and trimming a tree, but

these jobs led to re-injuries and required frequent injection treatments.  (Tr. 40).  He attempted to do

a part-time telemarketer job which he secured through the DVR, but he couldn't sit for any longer

than two hours at a time, even with medication.  (Tr. 54-56).

The record shows that May's attempts to work, in an effort to feed his family in the face of

eviction and "dire financial straits," only exacerbated his back condition.  A claimant's attempts to

return to work do not mean that he is capable of full time gainful employment.  Talbot v. Heckler,

814 F.2d 1456, 1461 (10th Cir.1987); Cavitt v. Schweiker, 704 F.2d 1193, 1195 (10th Cir.1983).

If a claimant cannot perform work falling within the definition of sedentary for more than a brief

period, the claimant cannot be found not disabled.  Cavitt, at 1195.    May argues in his reply

memorandum (at 4):

> The Commissioner primarily relies on Mr. May's high level of
> motivation and his post injury attempts to support his family and
> to maintain household functions as evidencing a lack of credibility . .
> .  The Commissioner relies heavily on Mr. May's statement that most
> of his problems have occurred when he did 'stupid things' such as
> lifting when he should not have . . .  This statement, rather than
> undermining any credibility or evidencing ability to perform work,
> indicates that Mr. May has been highly motivated and has attempted
> work activities that have exceeded his medical restrictions.   The
> Commissioner notes such things as his attempting to install security
> systems after he became disabled as seriously undermining Mr. May's
> credibility . . .  The Commissioner fails to note that Mr. May was
> injured in 1993, and did not apply for disability until 1995.  Mr. May
> continued to make attempts to work despite recommendations that he
> not return to work . . .  Mr. May's high level of motivation [as] noted
> in Dr. Burg's comment that he remained work oriented with a strong
> work ethic . . . should not be used to prejudice him.

The Court agrees.  "Findings as to credibility should be closely and affirmatively linked to

substantial evidence."  Huston, *supra*, at 1133.  The credibility finding in this case is not supported

by substantial evidence, and it will be reversed.

c. <u>The RFC Assessment</u>.

Because the ALJ's credibility determination is reversed, the RFC assessment must be re-examined also, as pain is one of the factors to be considered in setting the claimant's RFC. The record does not support the ALJ's finding that May is capable of the full range of sedentary work. "RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis . . . [*i.e.*], 8 hours a day, for 5 days a week." SSR 96-8p, *supra*. There is nothing on the record to show that May can do sustained work activities at a sedentary level for a complete work day or work week.

Sedentary work involves lifting no more than ten pounds at a time and occasionally lifting or carrying articles such as small tools. A sedentary job primarily involves sitting, although a certain amount of walking and standing is often necessary in carrying out job duties. 20 C.F.R. §§ 404.1567(a); 416.967(a) (2000). There is nothing in the record to indicate that May can sit for 8 hours a day, 5 days a week, even if he is allowed to stand up or walk around periodically.

Even in the notes of the consulting physician, which is the record cited by the ALJ as most supportive of May's ability to engage in gainful activity, Dr. Deming noted that May could sit for only 10 to 15 minutes in the examination room before he became uncomfortable and had to get up and move around. (Tr. 137). At other places in the record, he is described or describes himself as being unable to sit for "long periods of time" (Tr. 118, 122), being able to sit for 15 or 20 minutes at a time, only if taking a painkiller (Tr. 50), and, immediately after the back injury, being able to sit only for a short period of time before severe numbness and tingling set into his legs. (Tr. 196). Although May can lift his 27-pound twins, one at a time, if lifting from his side, he cannot carry one of the

20

children for any distance before his leg begins to go numb.  He also stated that he cannot lift a 22-ounce hammer, if lifting from the front.  (Tr. 52,  136).

As was true with the credibility finding, the ALJ gave as one basis for his RFC finding the fact that "the claimant has some ability to perform work activity, as evinced by his past work activity performing maintenance for a motel and his activities of daily living."  (Tr. 18).  However, "evidence that a claimant engages in limited activities, such as short-term work or driving, does not establish that the claimant can engage in light or sedentary work activity."  Gossett v. Bowen, 862 F.2d 802, 807 (10th Cir. 1988).

> The ALJ's conclusion that the claimant had been performing light and sedentary work on a regular and continuing basis after October 10, 1981, is highly questionable . . .  The record reveals that the  claimant tried to do a little painting work and installation of a shower on a contractual basis, as well as to assume a traveling sales job.  However, the record also indicates that he was unable to finish or keep these jobs because of his blackouts and strength limitations and that he was never paid for any of these attempts. Also, the record reveals that the claimant's daily routine was extremely limited.  He occasionally drove his wife three miles to the grocery store on back roads, and he tried to walk around his yard every day, but he seldom engaged in any other activity in or outside his home.   He could no longer hunt or fish, and even sweeping the floor of his home tired him out, so that he was not able to help his wife with domestic chores.  To call such nongainful activity regular and continuous light and sedentary work would seem to defy the record.

Talbot, at 1462.

The present case is very similar.  The record does not support a finding that May is capable of sedentary work.  When "it is clear from the record that the claimant did not retain the ability to perform a full or wide range of sedentary activity . . . it would serve no useful purpose to remand the case to the Secretary for evidence as to the claimant's vocational options."  Jozefowicz v. Heckler,

811 F.2d 1352, 1359 (10th Cir. 1987); *see also*, <u>Harris</u>, *supra*, at 543 ("We do not remand for additional fact-finding because there is enough evidence in the record of claimant's inability to perform a full range of either light or sedentary work to negate the usefulness of any additional proceedings").    The Court will therefore exercise its discretion to recommend a remand for immediate award of benefits.  <u>Nielson v. Sullivan</u>, 992 F.2d 1118, 1122 (10th Cir. 1993).  In light of this ruling, the other points raised by May need not be considered.

### Recommended Disposition

That May's Motion to Reverse or Remand [Doc. 7] be granted and the case be remanded to the Commissioner for an award of benefits.

Lorenzo F. Garcia
United States Magistrate Judge